792 So.2d 267 (2000)
TRUSTMARK NATIONAL BANK and Tonya Perkins, Co-Guardians of Jamiene Tyler Perkins, a minor, Appellants
v.
JEFF ANDERSON REGIONAL MEDICAL CENTER and Ronnye Purvis, M.D., Appellees.
No. 1998-CA-01304-COA.
Court of Appeals of Mississippi.
May 30, 2000.
Rehearing Denied October 10, 2000.
*268 Paul Snow, Jackson, Attorney for Appellants.
*269 Brooke Ferris, William Bennett Carter, Meridian, Romney Hastings Entrekin, Laurel, Attorneys for Appellees.
BEFORE McMILLIN, C.J., BRIDGES, PAYNE, AND THOMAS, JJ.
THOMAS, J., for the Court:
ISSUES
I. THE LOWER COURT ERRED IN REFUSING TO GRANT APPELLANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT
A. BECAUSE OF ADMISSIONS OF THE DOCTOR
B. BECAUSE OF THE PARTICULAR FACTS OF THIS CASE.
II. THE VERDICT OF THE JURY IS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
III. THE LOWER COURT COMMITTED REVERSIBLE ERROR BY DIRECTING A VERDICT IN FAVOR OF THE HOSPITAL WHEN THERE WERE MATERIAL FACTS IN DISPUTE.
IV. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY.
A. RES IPSA LOQUITUR

B. SUDDEN EMERGENCY AND/OR CONTRIBUTORY NEGLIGENCE OF MOTHER.
C. PEREMPTORY INSTRUCTION
V. BECAUSE OF THE ACTIONS OF THE ATTORNEY FOR THE DOCTOR, A NEW TRIAL SHOULD BE GRANTED.
A. BY WILLFULLY VIOLATING THE IN LIMINE ORDER OF THE COURT REGARDING THE REPUTATION OF THE DOCTOR
B. BY IMPROPER ARGUMENT REGARDING AN HONEST ERROR IN JUDGMENT.
C. BY APPEALING TO THE PASSION AND PREJUDICE OF THE JURY.
VI. A NEW TRIAL SHOULD BE GRANTED BECAUSE THE JURY'S QUESTION WAS NEVER RESPONDED TO BY THE COURT.
Finding no error, we affirm.

FACTS
¶ 1. Tonya Perkins was thirty-two years old when she was admitted to the hospital for delivery of her first child on September 6, 1994. She had been diagnosed with gestational diabetes at 22 weeks and was treated successfully. At 37 weeks she was brought into the hospital for an amniocentesis, which is a test to determine if the baby was mature. The baby was found to be mature, and the doctor initiated labor. Labor was induced the next day, and she started having contractions about noon on September 7, 1994. The testimony and doctors' records indicate that the mother was brought into the delivery room at 1:25 p.m. and the baby was delivered at 1:34 p.m. Tonya Perkins, who weighed approximately 200 pounds, had trouble pushing the baby out on her own, so the doctor used a Mightivac, an instrument used to suction the baby's head out of the mother. Once the infant's head was delivered, the doctor noticed that the umbilical cord was wrapped around the infant's neck so he removed the same.
¶ 2. There were six people in the delivery room at Jeff Anderson Regional Medical Center in Meridian when Tyler was born: Mrs. Tonya Perkins, her husband, James Perkins, Dr. Ronnye Purvis, labor and delivery nurse Janet Mowdy, nursery nurse Robin Butler, and OB technician Dolly McCarty. James Perkins did not *270 testify, and Nurse Robin Butler testified that she did not see the event.
¶ 3. Dr. Ronnye Purvis is a licensed and board certified gynecologist and obstetrician who has been practicing for more than ten years. He received a Bachelor of Science in Biology at Marquette University and his medical degree at the University of Wisconsin. He completed his residency at Mercy Hospital Medical Center, which is affiliated with the University of Illinois and Loyola University. He received a National Public Health Service Scholarship in medical school in exchange for being sent to work where needed after graduation. He was sent to Meridian, Mississippi and decided to stay once his required term was over. Dr. Purvis testified that once the baby's head had emerged he told the mother not to push so he could remove the cord from around the infant's neck. He then gave the command to push. He testified that the mother moved backwards and pushed aggressively, forcing him to move forward with her which put him in a crouched or half-standing position. Then the baby "shot" out with a great force and hit him in the chest or abdominal area, fell to the floor, and slid toward the head of the bed. The force of the delivery was so severe that the umbilical cord was broken off of the baby at its insertion site.
¶ 4. Nurse Dolly McCarty was in the room and testified that when Dr. Purvis said "push," Janet Mowdy, who was standing behind the mother, would then instruct the patient to push. She testified that after Dr. Purvis removed the umbilical cord from around the baby's neck and told the mother to push that the baby immediately hit Dr. Purvis at the waist and fell to the floor. She testified that she had never seen anything like it.
¶ 5. Nurse Janet Mowdy testified that she was at the head of the bed and that she repeated the Doctor's instructions to encourage the patient. She testified that after the doctor removed the umbilical cord from around the baby's neck and instructed the mother to push the mother sat up and pushed very aggressively and quickly, so quickly that the nurse did not have time to support the mothers shoulders. She testified that she saw a blur shoot out and that Dr. Purvis then came around the mother's right leg and picked up the baby from the floor.
¶ 6. The plaintiff's nurse expert testified that had the nurse instructed the patient to push without the doctor's express instructions to do so then the nurse would have been usurping the doctor's authority and violating hospital and nursing rules.
¶ 7. Dr. Harlan R. Giles testified as an expert witness for the plaintiff. Dr. Giles is a specialist in the field of obstetrics and gynecology and subspecialist in the field of perinatology, which is maternal-fetal medicine; he is board certified in the specialties and is licensed to practice medicine in Pennsylvania, West Virginia, North Carolina, Texas and Massachusetts. Dr. Giles completed undergraduate school, medical school, an internship in internal medicine, his residency in obstetrics and gynecology and his fellowships in reproductive endocrinology and maternal-fetal medicine at Duke University in Durham, North Carolina. Dr. Giles has been practicing for more than twenty-six years and has participated in more than seven thousand deliveries. Dr. Giles testified that he believed that Dr. Purvis had breached the standard of care. Dr. Giles testified that the delivery of Tyler could not have been an explosive delivery because Dr. Purvis had to use the vacuum to get the baby's head to come out, signifying that it was not a spontaneous birth. Furthermore, Dr. Giles testified that the umbilical cord gas showed acidosis, which shows that the baby was deprived of oxygen long enough for his *271 acid level to build up between the time the head was delivered and the time that the baby was fully delivered. Dr. Giles says that it would take between four to six minutes of delay for the acidosis to develop to the level it was at on Tyler, which leads him to believe that shoulder dystocia had developed. Shoulder dystocia is where the shoulder gets trapped or impacted behind the mother's pubic bone. Dr. Giles testified that several maneuvers are used to relieve the dystocia, none of which were used by Dr. Purvis. Dr. Giles testified that had Dr. Purvis reacted correctly to the shoulder dystocia, Tyler would not have fallen to the floor.
¶ 8. Dr. John Morrison was called to testify as an expert witness on behalf of the defense. Dr. Morrison went to undergraduate school at Memphis State University and medical school at University of Tennessee College of Medicine. He did his four-year residency in OB/GYN at the City of Memphis Hospital. Then he served two years in the United States Army and taught at the University of Tennessee before he moved to Jackson and started teaching at the University of Mississippi Medical Center where he is currently a professor of OB/GYN and Pediatrics and is the Chairman of the Department of OB/GYN. He is board certified in OB/GYN and maternal and fetal medicine and licensed to practice medicine in the states of Mississippi, Tennessee, Arkansas and California. He has been practicing for more than twenty-five years and has delivered or assisted in the delivery of eight to ten thousand babies. Dr. Morrison testified that Dr. Purvis did meet the standard of care in delivering Tyler. He stated that an explosive delivery occurs at the University Medical Center around eight or ten times out of four thousand deliveries. Dr. Morrison testified that in the set of circumstances that occurred with the delivery of Tyler, the patient moving, Dr. Purvis trying to reposition himself and the explosive delivery, Dr. Purvis acted within the standard of care and was not negligent. He also testified that the records as well as the testimony of all the people in the delivery room prove that the baby did not have a shoulder dystocia. The doctor testified that had a shoulder dystocia occurred the people in the room would have definitely been aware of that fact.
¶ 9. Dr. Purvis also testified to the events. He testified that the baby did not have shoulder dystocia and if such a problem had occurred he would have instructed the nurses to take the mother's legs out of the stirrups and push one of the legs down toward her chest to change the pelvic tilt to attempt to release the baby's shoulder and deliver the remaining portion of the baby. Furthermore, Dr. Purvis addressed the comments by Dr. Giles regarding the umbilical cord. Dr. Purvis explained that usually the umbilical cord is clamped once near the baby's insertion point and once closer to the mother. Then the cord is cut between the two clamps, freeing up the baby. Then the remaining part of the cord is clamped once again and a part of the cord is cut off and brought to the lab, this retains the elements that were last given to the baby. Dr. Purvis testified that he only paused long enough to remove the umbilical cord from around the baby's neck and there was no "extended" length of time where only the baby's head was delivered. Dr. Purvis explained that the baby was severed from the cord and the cord that was still connected to the mother was left dangling without clamps and the blood supply and nutrients that were going to the baby were still running, thus explaining that the ph and the acid tests from the cord would be inaccurate. Dr. Purvis also ran through all the steps that took place from the moment the mother *272 was brought into the delivery room at 13:25 until the delivery of Tyler at 13:34. He testified that many things took place during these nine minutes and that there was not any unaccounted for time.
¶ 10. The plaintiffs claim that Dr. Purvis' story at his deposition was different from his story at trial. His deposition in part stated:
Q: Did you ever give her any other commands at that time like
A. Don't push. Don't push. Stop. Push. Come back down toward me.
Q. You did tell her to
A. Yeah.
Q. Tell me what you told her.
A. Don't push. Don't push. Stop. Come back toward me this way. Come down this way.
Q. Was it too late?
A. It was too late.
Q. Okay. You said the baby came out of the womb and hit you?
A. In the chest.
Q. In the chest?
A. Yes, sir.
Q. Okay. Did you try to catch the baby?
A. Absolutely.
Q. You just missed?
A. My hands was on it. It was just so wet and slimy. I guess I did miss.
During the trial the doctor testified in part:
Q. But it's your testimony under oath to this jury that Mrs. Perkins butt came up off the table; isn't that true?
A. That is the truth.
Q. Are you telling this jury that's
A. I am telling the jury that Mrs. Ty Mrs. Perkins raised her buttocks off of the table, pushed her shoulders into the table, moved forward. I assisted with her, attempting not to break contact in this unexpected event, and that's how the delivery occurred.
Q. You were in control of the delivery at all times?
A. That is correct.
Q. You are the only one?
A. I am the only one.
Q. And you were in control of these commands, and you were the only one?
A. I gave the command for Mrs. Perkins to push.
Q. And you were the only one in control
A. I am the only one that was in control of the delivery.
Q. Now, isn't it true that at some point in time that you told Mrs. Perkins during the delivery, stop, don't push?
A. That is correct.
Q. Do you remember telling her that?
A. I do.
Q. And you remember your exact words don't push. Stop. Push. But it was too late. Do you remember saying that?
A. I do remember saying that.
Q. Don't push, stop, push. Was there a lot of confusion going on then, Doctor?
A. No, sir.
Q. You are sure about that?
A. Yes, sir. I'd like to explain it.
Q. Go ahead.
A. When the cord is around the neck, it is tight. You ask the patient don't push. When you are trying to reduce the cord, you are trying to get some slack on the cord so I'll say push a little bit, don't push, *273 push a little bit more. I got the cord up around the neck. Now, that's where we are right now with the cord from around the neck. I gave several commands in order to try to get some lax on the cord itself.
Q. And Mrs. Perkins reared back on the table?
A. Yes.
Q. And up?
A. Yes, sir.
¶ 11. Tyler has traumatic encephalopathy with developmental delay which involves both motor and mental spheres due to the injury caused by hitting his head on the floor. Tyler also has problems with cognitive and emotional development, in addition to having a noticeable physical disability.
¶ 12. The case was tried in the Circuit Court of Lauderdale County in Meridian, Mississippi. The trial judge granted the hospital's motion for a directed verdict after the plaintiffs rested. The jury returned a verdict in favor of the doctor. The guardian filed her motion for a judgment notwithstanding the verdict, or in the alternative, for a new trial, which was argued on September 29, 1998. The trial judge denied the guardian's motion for a judgment notwithstanding the verdict, or in the alternative, for a new trial.

ANALYSIS

I. THE LOWER COURT DID NOT ERR IN REFUSING TO GRANT APPELLANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT.

A. BECAUSE OF THE ADMISSIONS OF THE DOCTOR.

B. BECAUSE OF THE PARTICULAR FACTS OF THIS CASE.
¶ 13. Perkins claims that the circuit court's denial of the Motion for JNOV should be reversed because of "admissions" by Dr. Purvis while he was on the stand. Dr. Purvis clarified and explained each one of the "admissions" pointing out that many were taken out of context and that none of the statements signify a deviation from the standard of care.
¶ 14. Perkins also argues that the motion for JNOV should have been granted because of the facts of the case. They allege that the testimony is almost undisputed and states that Dr. Purvis was in charge of the delivery, the mother did not move up and away from the doctor, and the baby fell to the floor which does not usually happen if the standard of care is met. The defense, however, points out that the delivery was not a normal delivery and the testimony is not as Perkins represents it. The defense maintains that the testimony supports that the baby "shot out like a rocket" which shows it was not a normal delivery. Furthermore, the defense argues that several nurses testified they did not recall whether the mother moved up off the bed, which is not the same thing as stating the mother did not move up as Perkins would have the court believe.
¶ 15. The Court uses the following analysis as the standard of review for denial of a judgment notwithstanding the verdict:
[The evidence is considered] in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, [then the Court is] required to reverse and render. On the other hand if there is substantial evidence in support *274 of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.
American Fire Protection, Inc. v. Lewis, 653 So.2d 1387, 1390 (Miss.1995) (citations omitted). In other words, all credible evidence tending to support the non-movant's case and all favorable inferences reasonably drawn there from are accepted as true and work to the benefit of the nonmover. C & C Trucking Co. v. Smith, 612 So.2d 1092, 1098 (Miss.1992) (citations omitted). Applying this standard to the case at bar, we find that there is substantial evidence in the record to support the jury verdict, and the evidence is of such quality and weight that affirmance of the verdict is required.
¶ 16. In the case at bar, the trial judge was correct in denying the Perkinses' motion for JNOV. There was sufficient evidence for the jury to make its determination, and the verdict in favor of the defendant was supported. An appellate court may only reverse a jury verdict when the facts considered in that light point so overwhelmingly to the appellant's position that reasonable men could not have arrived at a contrary verdict. Wilmoth v. Peaster Tractor Co. of Lexington, Inc., 544 So.2d 1384, 1386 (Miss. 1989). The jury resolved this dispute in favor of Dr. Purvis and the hospital. On disputed matters of fact, this Court will not substitute its findings for those of the jury. Evans v. State, 159 Miss. 561, 566, 132 So. 563, 564 (1931).

II. THE VERDICT OF THE JURY IS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
¶ 17. Perkins contends that the jury verdict in favor of Dr. Purvis and the Hospital was against the overwhelming weight of the evidence and that the trial court erred by not granting a new trial. Perkins asserts that the weight of the evidence shows that Dr. Purvis was negligent in dropping the infant at the time of delivery.
¶ 18. A motion for a new trial challenges the weight of the evidence. Henson v. Roberts, 679 So.2d 1041, 1045 (Miss.1996). The grant or denial of a motion for a new trial is a matter within the sound discretion of the trial judge. May v. State, 460 So.2d 778, 781 (Miss.1984). The credible evidence of the case must be viewed in the light most favorable to the non-moving party. Clark v. Columbus & Greenville Ry. Co., 473 So.2d 947, 950 (Miss.1985). When the evidence is viewed as such, the motion should be granted only when upon a review of the entire record the trial judge is left with a firm and definite conviction that the verdict, if allowed to stand, would work a miscarriage of justice. Our authority to reverse is limited to those cases wherein the trial judge has abused his discretion. Moody v. RPM Pizza, Inc., 659 So.2d 877, 881 (Miss. 1995). "In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial." Herrington v. Spell, 692 So.2d 93 103 (Miss. 1997). The jury is the ultimate judge of the weight of the evidence and the credibility of the witnesses. Jackson v. Griffin, 390 So.2d 287, 289 (Miss.1980). Because of the jury verdict in favor of the appellee, this Court will resolve all evidentiary conflicts in the appellee's favor and will draw all reasonable inferences which flow from the testimony given in favor of the appellee. Southwest Miss. Reg'l Medical Ctr. v. Lawrence, 684 So.2d 1257, 1267 (Miss. *275 1996) (citing Bobby Kitchens, Inc. v. Mississippi Ins. Guar. Assoc., 560 So.2d 129, 131 (Miss.1989)). We will not set aside the jury's verdict unless the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. Herrington, 692 So.2d at 104.
¶ 19. In the case at hand, we cannot say that the verdict of the jury was clearly erroneous. This was a very lengthy trial in which both sides put on numerous witnesses, including expert witnesses. The questions presented and argued during trial about whether Dr. Purvis dropped the infant or whether the mother came up off the table or whether the birth was a precipitous one, were issues for the determination of the jury. The jury, being the ultimate fact finder, by its verdict necessarily found that Dr. Purvis did not drop the infant, was not negligent in not "catching" the infant, and that Dr. Purvis did not breach the standard of care in delivering the infant. Therefore, we cannot say that the jury verdict was against the weight of the evidence, and the trial court did not err in failing to award a new trial to Perkins.

III. THE LOWER COURT COMMITTED REVERSIBLE ERROR BY DIRECTING A VERDICT IN FAVOR OF THE HOSPITAL WHEN THERE WERE MATERIAL FACTS IN DISPUTE.
¶ 20. Perkins argues that it was error for the trial court to grant a directed verdict in favor of the Hospital. Perkins maintains that the testimony of the doctor, Nurse Mowdy and Mrs. Perkins state that Nurse Mowdy instructed Mrs. Perkins to push and that the expert witness proved that Nurse Mowdy breached the standard of care by telling Mrs. Perkins to push without an agreement or signal from the doctor. The Hospital correctly points out that all the testimony states that Nurse Mowdy told Mrs. Perkins to push after the doctor first instructed her to push, including the testimony of Mrs. Perkins. Furthermore, the Hospital relies on the testimony of Perkins's own expert which stated that Nurse Mowdy would only have breached the standard of care, thus making the hospital liable, if the doctor had not instructed the patient to push first, before the nurse repeated the instruction.
¶ 21. The standard of review for the denial of a motion for directed verdict and a motion for judgment notwithstanding the verdict is identical. Steele v. Inn of Vicksburg, Inc., 697 So.2d 373, 376 (Miss.1997). As stated above, all credible evidence tending to support the non-movant's case and all favorable inferences reasonably drawn therefrom are accepted as true and work in favor of the non-mover. C & C Trucking Co., 612 So.2d at 1098. If the favorable inferences have been reasonably drawn in favor of the non-moving party so as to create a question of fact from which reasonable minds could differ, then the motion for directed verdict would not be granted and the matter should be given to the jury.Sperry-New Holland v. Prestage, 617 So.2d 248, 252 (Miss.1993).
¶ 22. All the testimony in the record indicates that Nurse Mowdy told Mrs. Perkins to push to help encourage her after Dr. Purvis first instructed her to push. Furthermore, Perkins's expert witness also testified that Nurse Mowdy would have breached the standard of care only if she had instructed the mother to push without having first received a command or instruction from this physician. There is no testimony or proof upon which any inference can be made that Nurse Mowdy took it upon herself to instruct the patient to push, thereby breaching the standard of care. Therefore, the plaintiff did not establish their prima facie case. We find *276 there was no conflicting testimony or evidence for the fact finder to determine. The trial judge stated and we agree:
The expert that the plaintiff is relying on to establish a fact question for the jury as it relates to Jeff Anderson Hospital is Dr. Linda F. Samson. And her testimony by way of video, as I understood it, is that the nurses deviated from the minimal accepted standards of care, particularly Nurse Mowdy, by having the patient push without first obtaining instructions from the doctor verbal or in some other fashion have the patient push. I know there have been numerous depositions in this case and voluminous discovery, but I have not heard evidence presented to this jury that, in my judgment, would permit a fact finder to conclude that Mrs. Mowdy erroneously instructed the patient to push without having first received instructions from the physician.
.... I cannot conclude that a fact issue exists in this case as relates to the nurses.
This issue is also without merit.

IV. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY.

A. RES IPSA LOQUITUR

¶ 23. Perkins claims that the lower court erred in not instructing the jury on res ipsa loquitur which means "the thing speaks for itself." Perkins argues that Dr. Purvis himself testified that if due care and skill were exercised babies do not get dropped; thus, the mere fact that Tyler was dropped "speaks for itself" and due to the facts of this case, the trial judge should have instructed the jury on this doctrine. Perkins admits that the instruction was withdrawn but states that the instruction was only withdrawn because the trial court requested each party submit only six instructions and had previously commented that the res ipsa loquitur instruction presented was not the law. Perkins maintains the instruction should have been granted but they did not want to waste one of their six instructions, knowing it would be refused. The defense argues that Perkins withdrew the res ipsa loquitur instruction and therefore cannot place the lower court in error on appeal and furthermore, that the case is not a res ipsa loquitur case.
¶ 24. Upon review of all documents involving this appeal, it becomes clear that the jury instruction at issue was withdrawn by Perkins, without objection, before instructions were given to the jury. M.R.C.P. 51(b)(3) states that "no party may assign as error the granting or the denying of an instruction unless he objects thereto at any time before the instructions are presented to the jury; opportunity shall be given to make the objection out of the hearing of the jury. All objections shall be stated into the record and shall state distinctly the matter to which objection is made and the grounds therefor...." This issue was never presented to the trial court for review and may not be raised for the first time on appeal. Century 21 Deep South Properties v. Corson, 612 So.2d 359, 371 (Miss.1992). Perkins was given the opportunity to do the above and failed to do so. Therefore, their failure to object at the trial level constitutes a waiver and prevents the issue from being able to be raised on appeal. Gatlin v. State, 724 So.2d 359 (¶ 43) (Miss.1998).

B. SUDDEN EMERGENCY AND/OR CONTRIBUTORY NEGLIGENCE OF MOTHER.
¶ 25. Perkins argues that instruction D-5 amounts to a sudden emergency instruction which has been abolished and granting it constituted reversible error. Perkins alleges that the instruction circumvented the doctor's testimony that the mother was not negligent and the doctor's *277 waiver of any affirmative defenses regarding the mother's negligence, allowing the jury to find that the mother's actions caused the incident.
¶ 26. The defense argues that instruction D-5 is not a sudden emergency instruction. The defense explains that a sudden emergency instruction lowers the duty owed because of a sudden and unexpected situation. The defense maintains that incorporating a factual situation that involved an unexpected occurrence does not make an instruction a sudden emergency instruction, as long as the instruction recites the appropriate negligence standard. Additionally, the defense argues that the instruction does not imply that Mrs. Perkins was contributorily negligent, but explains that the instruction recites that fact that Mrs. Perkins had an uncontrollable urge to push which caused her to move up the table. We agree.
¶ 27. Jury instruction D-5 reads (emphasis added):
You are instructed that if you believe that Dr. Ronnye Purvis was located in the proper medical position to assist Mrs. Perkins with delivery of her child and that he had his hands in a proper position to assist with her delivery and that suddenly and unexpectedly Mrs. Perkins moved her body upwards and backwards towards the head of the delivery table and away from where Dr. Purvis was located and that after moving away from Dr. Purvis, Mrs. Perkins spontaneously delivered her baby with such substantial force that it departed her womb and was propelled through the air and struck Dr. Purvis in the chest and thereafter fell to the floor before Dr. Purvis had any opportunity to re-position his hands to the baby and if you further believe that there was neither time nor space for Dr. Purvis, in the exercise of reasonable medical care and skill to catch and secure the baby, then you would be justified in determining that this incident occurred without any negligence on Dr. Purvis' part.
¶ 28. This issue is without merit.

C. PEREMPTORY INSTRUCTION
¶ 29. Perkins maintains that the trial judge should have given the infant's peremptory instruction, P-1(a). Peremptory instructions require the same standard of review as a JNOV. As stated herein above we disagree with Perkins's contentions. This issue is without merit.

V. BECAUSE OF THE ACTIONS OF THE ATTORNEY FOR THE DOCTOR, A NEW TRIAL SHOULD BE GRANTED.

A. BY WILLFULLY VIOLATING THE IN LIMINE ORDER OF THE COURT REGARDING THE REPUTATION OF THE DOCTOR
¶ 30. Perkins argues that the trial judge sustained a motion in limine requesting the court to order that the doctor and his attorneys refrain from mentioning anything at trial concerning the reputation of the doctor. Perkins claims that Walter Eppes, attorney for Dr. Purvis, brought out the reputation of the doctor in closing arguments in violation of the court's order, constituting reversible error. Mr. Eppes stated:
I am persuaded that he is an extremely talented person that we need to be proud we have him in our community. I don't think there is much doubt that you are looking at one of the really fine obstetricians in Mississippi.
¶ 31. Contrary to Perkins's claim, the record reveals that the lower court ruled this subject was not proper for a motion in limine and the trial judge stated he would deal with the issue "as it comes up in trial." As the defense correctly points out, *278 Perkins did not object at trial and therefore cannot raise the issue on appeal. Failure to raise a contemporaneous objection constitutes a waiver of the issue on appeal. Gatlin, 724 So.2d at 359. This issue is procedurally barred.

B. BY IMPROPER ARGUMENT REGARDING AN HONEST ERROR IN JUDGMENT.
¶ 32. Perkins also alleges that the doctor's attorneys argued throughout the trial that the doctor should not be liable for a mere honest error in judgment. Perkins maintains that this argument should not have been allowed, constituting reversible error. Perkins has failed to point out where this phrase occurs in the record, and we are also unable to find an instance. Furthermore, Perkins did not make any objection to any argument during the trial. Failure to raise a contemporaneous objection constitutes a waiver of the issue on appeal. Id. Therefore, the argument is without merit.

C. BY APPEALING TO THE PASSION AND PREJUDICE OF THE JURY.
¶ 33. Perkins alleges that counsel for the doctor argued that Perkins hired lawyers from Jackson and the jury should not find against a local doctor. Perkins maintains this appealed to the passion and prejudice of the jury such arguments had been previously criticized. Again the defense points out that Perkins did not make a contemporaneous objection at trial, thus prohibiting it to be raised on appeal.
¶ 34. We reiterate that it is incumbent on counsel to object contemporaneously when objectionable statements are given during the trial so the trial judge can correct any error with proper instructions to the jury. Shelton v. State, 445 So.2d 844, 846 (Miss.1984). Failure to raise a contemporaneous objection constitutes a waiver of the issue on appeal. Gatlin, 724 So.2d at 359. This issue is also procedurally barred.

VI. A NEW TRIAL SHOULD BE GRANTED BECAUSE THE JURY'S QUESTION WAS NEVER RESPONDED TO BY THE COURT.
¶ 35. Perkins maintains that a new trial should be granted because the jury asked a question which went unanswered. Perkins argues that the jury was confused and the case should be reversed for another trial because the confusion was never cleared up. They rely on Arledge v. McFatter, 605 So.2d 781 (Miss.1992), where the trial court did not provide a timely response to a jury question and the jury reached a verdict. On review the Supreme Court of Mississippi held that the trial judge should have re-instructed the jury after the question or immediately informed the jury that a response was forthcoming, because the court cannot presume that the confusion has been resolved. Id. at 783-84. The supreme court also stated that the trial court should have gotten "assurances on the record that the confusion was correctly resolved." Id.
¶ 36. The defense, however, argues that the jury never reduced the question to writing as required. Furthermore, the defense points out that the jury told the bailiff to "forget it" five minutes later and shortly thereafter returned a verdict. The defense maintains that the Arledge case can be distinguished from the case at bar because the jury in the Arledgecase submitted a written request and waited forty-five minutes for a response whereas in the case at bar the jury did not submit a written request and immediately thereafter stated "forget it."
¶ 37. After the jury returned a verdict and was released it was brought to the court's attention that the jury had asked a *279 question during deliberations. The record states:
Mr. Snow: Judge, could we put on the record the question the jury asked?
Court: I didn't know they asked a question.
Mr. Snow: I didn't either until my co-counsel told me. I think he asked the bailiff a question.
Court: I am not aware of any question being asked.
Mr. Carter: It wasn't submitted in writing, Your Honor. I don't think it is proper to put it on the record.
Court: I don't know what you are speaking about. What?
Mr. Snow: Did the jury asked [sic] a question, sir?
Bailiff: They told methey told me that they had a question, and I told them they would have to put it on a piece of question [sic] and send it to the judge.
Mr. Snow: Could you tell the judge what the question was?
Bailiff: Verbatim I probably couldn't.
Mr. Snow: Just do the best you can, sir.
Bailiff: All right. They askedthey said we have got a question and said we don't think he's guilty of being negligent, but we think that he might ought to have something. And I told them they would have to write that on a piece of paper and give it to the judge.
Court: Did they ever do that, Kenneth? They ever reduce anything to writing?
Bailiff: In about five minutes they knocked on the door and told me just forget it.
Court: How long after that was it that they let you know they had reached a verdict?
Bailiff: About 15 minutes.
Court: About 15 minutes after that?
Bailiff: Yes, sir.
Court: Okay. Thank you. Anything else?
Mr. Snow: No, sir, thank you.
Court: All right. We will stand adjourned.
¶ 38. The bailiff acting on behalf of the court responded appropriately. This is a non issue. The jury did not present a question for the judge to respond to. Rule 3.10 of the Uniform Circuit and County Court Rules states:
If the jury, after they retire for deliberation, desires to be informed of any point of law, the court shall instruct the jury to reduce its question to writing and the court in its discretion, after affording the parties an opportunity to state their objections or assent, may grant additional written instructions in response to the jury's request.
The judge acted appropriately, and there is no issue of whether the jury's confusion, if any, was resolved. A trial judge will not be found in error on a matter not presented to him for decision. Jones v. State, 606 So.2d 1051, 1058 (Miss.1992). This issue is without merit.

CONCLUSION
¶ 39. The record before this court presents a tragic and heart wrenching case, not only for the mother and child but also for the doctor. The case was tried hard by able counsel on both sides and with an experienced and learned circuit judge, the Honorable Larry Roberts, presiding. Setting sympathy aside, which all would naturally labor, we are constrained to affirm the verdict of the jury.
¶ 40. THE JUDGMENT OF THE CIRCUIT COURT OF LAUDERDALE COUNTY IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
*280 McMILLIN, C.J., SOUTHWICK, P.J., IRVING, AND MOORE, JJ., CONCUR. BRIDGES, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., AND PAYNE, J. LEE, J., NOT PARTICIPATING.
BRIDGES, J., DISSENTING:
¶ 41. With respect to my colleagues in the majority, I must write separately to express my concern with several issues raised on appeal. Specifically, I feel jury instruction D-5 was given in error in that an incomplete legal standard was presented to the jury for consideration. In addition, I believe that the trial judge should have granted the motion for a JNOV regarding Dr. Purvis. Accordingly, I dissent.
¶ 42. Jury instruction D-5, cited in full in the majority opinion, proposes a list of conditions concerning the situation surrounding the delivery of the child for each juror to consider in light of the accompanying standard of care. However, the instruction is predicated on an incomplete legal standard that, when coupled with the conditions precedent, eases the standard presented to the jury thus giving the defense an unfair advantage in the deliberation process. The troublesome language is emphasized by the majority, which tells the jury that "if you further believe that there was neither time nor space for Dr. Purvis, in the exercise of reasonable medical care and skill to catch and secure the baby, then you would be justified in determining that this incident occurred without any negligence on Dr. Purvis' part." (emphasis added). The standard of care regarding medical malpractice was outlined in Palmer v. Biloxi Regional Medical Center, Inc.:
[E]ach physician has a duty to use his or her knowledge and therewith treat through maximum reasonable medical recovery, each patient, with such reasonable diligence, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment and options.
Palmer v. Biloxi Reg'l Medical Ctr., Inc., 564 So.2d 1346, 1354 (Miss.1990).
¶ 43. Under Mississippi law, appellate courts do not review jury instructions in isolation, but rather as a whole to determine if the jury was properly instructed. Day v. Morrison, 657 So.2d 808, 814 (Miss. 1995). Where one or more instructions may have been awkwardly worded, we should not reverse if other instructions clear up the confusing points. Day, 657 So.2d at 814. Of course, where two or more instructions are in substantive conflict with each other, we may reverse. Id. at 814. I believe that the language in the disputed instruction offers a substantively different standard than the one outlined in instruction C-11, which reads: "Medical negligence on the part of a physician practicing in the file [sic] of obstetrics such as Dr. Purvis is the failure of the physician to possess and exercise that degree of care, diligence and skill as is ordinarily possessed and exercised by other minimally competent and reasonably diligent, skillful, careful and prudent obstetricians practicing throughout the United States."
¶ 44. Mere definition of the standard of care does not direct the jury to do anything. McCarty v. Kellum, 667 So.2d 1277, 1288 (Miss.1995) (citing T.K. Stanley, Inc. v. Cason, 614 So.2d 942, 952 (Miss. 1992)). Clearly the language in instruction D-5 is more relaxed than the phrasing in C-11. Thus, when the standard is restated in a less stringent manner attached to a laundry list of hypothetical clauses, the *281 jury is left to ponder which version of the standard should be applied.
¶ 45. In addition, I feel as though the motion for judgment not withstanding the verdict should have been granted against Dr. Purvis. The standard of review for denial of a judgment notwithstanding the verdict and directed verdict are identical. American Fire Protection, Inc. v. Lewis, 653 So.2d 1387, 1390 (Miss.1995). Under this standard, the Court uses the following analysis:
[The evidence is considered] in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, [then the Court is] required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.
American Fire Protection, Inc., 653 So.2d at 1390. Considering the motion in the light most favorable to the party opposing the motion, I believe the evidence unquestionably reveals Dr. Purvis's negligence in the delivery of the Perkins child.
¶ 46. In order to recover under a negligence theory in a medical malpractice action, a plaintiff must prove by a preponderance of the evidence that the defendant owed him a legal duty, that the legal duty was breached by the defendant by failing to conform to the required standard of care, that the defendant's breach proximately caused an injury to the plaintiff, and that the plaintiff suffered damages as a result. Latham v. Hayes, 495 So.2d 453, 457 (Miss.1986). It is undisputed that Dr. Purvis had a duty to Mrs. Perkins and her child. It is also clear that the child suffered an injury related to the treatment given by Dr. Purvis and incurred enormous damages as a result of that encounter. The only question is whether or not Dr. Purvis breached the standard of care cited in Palmer. I think he did.
¶ 47. The trial court found that the infant was not negligent as a matter of law and further found that the mother's negligence, if any, could not be imputed to the child. Testimony was presented at trial by Dr. Purvis that he was the only one in control of the delivery at all times. He also admitted during cross-examination that so long as the applicable standard of care is adhered to, babies are not normally dropped in the course of a delivery. This is tantamount to an admission of breaching the standard of care. An injury of this nature does not occur but for someone's negligence. If the infant, mother and nurses cannot be negligent, the doctor must be responsible for the tragic consequences of a delivery under his exclusive control. Having met all four elements in a traditional negligence case based upon the admission of the defendant doctor, it is hard for me to believe that reasonable jurors could disagree that fault rests with the doctor in absolute control of the delivery. Based upon this reasoning, I would reverse decision of the trial court only as it relates to Dr. Purvis by granting a JNOV and holding a trial for damages.
KING, P.J., AND PAYNE, J., JOIN THIS SEPARATE OPINION.